(No. 19462.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THEODORE WILSON, Plaintiff in Error.

*Opinion filed April 20, 1929.*

JOSEPH B. LOFTON, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Theodore Wilson was indicted in the criminal court of Cook county jointly with Joseph Allman and Frank Wilson for robbery while armed with a pistol. His co-defendants pleaded guilty and he was put on trial alone and convicted and has sued out a writ of error.

The defense was an alibi. Margaret Halliday, the victim of the crime, testified that she conducted a delicatessen store at No. 1353 West Seventy-ninth street, in Chicago. Mrs. Norman, a colored woman, was in the back room when three men entered the store, one of whom, the plaintiff in error, bought some groceries and handed witness a dollar-bill in payment. She was handing him the change when one of the other men pushed a gun at her and told her to be quiet and everything would be all right. The other man was Frank Wilson. He was at the door and went into the back room ahead of witness with his gun in his hand and ransacked the place back there, and while he was taking her back Allman told the plaintiff in error to wait on the store. The two women were in the back room from 9:10 until about 9:35 o'clock. They tied witness and the colored woman together, binding their feet and hands and heads. Witness' fur coat, ring and vibrator and $25 from the cash register were taken. Mrs. Norman got her bandage loose and started to scream. A man came in, and without waiting to untie them ran out on the street, calling, "Hold-up!" Two motorcycle policemen who were passing came in, and after talking with witness arrested Allman and Frank Wilson at about 9:40 o'clock, about three blocks from the store. They found on them all the property which had been taken, including the $25, and a loaded gun on each of them. Mrs. Halliday testified that the plaintiff in error did not have a gun, and on cross-examination said that Mrs. Norman did not see him, as she was not in the store, and that witness could not see him while she was in the back room. The plaintiff in error was arrested on the night of October 3 at the place where he roomed and boarded with Mrs. Bergamin, 713 West Fiftieth street.

The plaintiff in error testified that on October 3 he was at 713 West Fiftieth street, where he roomed and boarded

with Mrs. Bergamin, as he had been doing for about a year and a half. He got up about seven o'clock in the morning and went to a poolroom. Afterward he took a bath and went back to bed. About half or three-quarters of an hour later he got up and called his mother on the telephone. That was a little after eight o'clock. His mother came down to him with some underwear and a clean shirt and left two dollars with him. She got there about 8:45 or 9:00 o'clock, sat down and talked with him and left about 11:30. He had been a truck driver, employed for about six years for the Consumers Company, but had quit because he was sick. He had kidney trouble. He was arrested about 10:30 o'clock that night. His mother and sister were there at the time. He did not go into Mrs. Halliday's store on October 3 and make a purchase, was not near the store and never saw it, and had nothing to do with the robbery.

Frank Wilson testified that he is a brother of the defendant and is in the penitentiary at Joliet. He was indicted with his brother and Joe Allman, and he and Allman pleaded guilty and were sentenced to the penitentiary but his brother was innocent. He saw his brother at the police station the day after he was arrested and previous to that had not seen him for ten or twelve months. About 8:30 o'clock on the morning of October 3 he and Allman entered the store of Mrs. Halliday—just the two of them. Mrs. Halliday was alone in the store. He entered first and went to make a purchase. While he was making the purchase Allman came in and held up the front of the store and witness ran in the back room. Allman came in immediately afterward. Witness met the colored woman just coming into the store from the rear room and told her to go back and sit down and nothing would happen, and Allman brought Mrs. Halliday back. Witness talked to her and told her nothing would happen to her and asked her

where the money was. She said the money had already left. He told Allman, "Let's leave immediately," and went out in the store and took some money from the cash register and went back again. Allman was taking Mrs. Halliday's coat. She said, "Please don't take that," and witness said, "Leave it there and let's go." They walked out in the street and were not out of the place a half minute when somebody entered, and they were about a block and a half away when they were arrested. His brother was not with him that day. There were only two men in the store during the progress of the hold-up, witness and the other man who participated in the robbery.

Bridget Wilson, the mother of the plaintiff in error, testified that she had been living for two years at 1116 West Seventy-second street with her daughter, Mrs. Kennedy. The plaintiff in error went to board with Mrs. Bergamin in 1926, when witness broke up housekeeping and went to live with her daughter. Before that the plaintiff in error lived with witness. On October 3 she received a telephone call about eight o'clock in the morning from her son, telling her he was sick and asking her to bring some clean underwear. She went over to see him and gave him a couple of garments. He was there when she got there, about 8:30 o'clock. She stayed until about half-past eleven. It was a couple of minutes before 12:00 o'clock when she got home, and the plaintiff in error was there when she left. That evening she told her daughter about it, and they went over and saw the plaintiff in error there at that time. The next day she went to see Mrs. Halliday and asked her how she knew Ted was there at the time. Mrs. Halliday told her he had something sore on his neck. Witness said that Ted hadn't anything sore on his neck, and Mrs. Halliday said, "Well, there was some lump on his neck; he bought a can of soup and loaf of bread;" that he had a lump on his neck and she recognized

him from his Adam's apple. She told witness that the man with something on his neck came into the store and asked to make a purchase. She was not positive that Ted was the man, but she said the police told her if she did not prosecute him that she would not get any more protection from them. She said she did not want to do it, but she had to do it or they would not give her any more protection. Mrs. Wilson also testified that she heard Mrs. Halliday testify before Judge Padden in the police court on October 10, and she then testified that the man who came into the store first purchased a can of soup and a loaf of bread and paid for it and walked out and a minute or two later Allman and Frank Wilson came in. She said that the boys were there; that Theodore walked out after he bought the loaf of bread and the can of soup and she did not see him any more. She said the man with the sore throat was the one who made the purchase and he was the one who walked out, and she was not positive whether it was Wilson or not.

Pearl Bergamin testified that on October 3, 1928, she lived at 713 West Fiftieth street and had lived there about a year. She was a widow and lived there with her two little girls and had worked for five years at 210-212 West Lake street, where she was then employed. She had known the plaintiff in error three years. He came first to her home in 1926 and had roomed and boarded with her about two years and paid $10 a week. She saw him on the morning of October 3 at 7:00 o'clock, when she left for work, and at 5:30 o'clock that night, when she returned from work, he was sitting on the bed on the back porch.

Mrs. Halliday testified in regard to the conversation with Mrs. Wilson that the latter came to her house on October 4 and told her not to prosecute—that they were good Catholic boys. It was not the day following the robbery but the day before she went to the Grand Crossing station. She did not tell Mrs. Wilson at that time that a

man came into the store with a flannel around his neck and that he did not do anything but merely paid for a can of soup and for the bread and then walked out about his business; that it was not true that Mrs. Wilson then said, "Well, my boy never had any sore throat—he did not have any bandage around his neck," and she replied, "Well, it must have been his Adam's apple;" that she did not remember talking to the police officers in regard to the plaintiff in error, and that it was not true that she said to Mrs. Wilson, when Mrs. Wilson came to see her, that the police officers told her that if she did not say that the man who came into the store to buy the soup was Ted Wilson they would not give her any more protection. She testified before Judge Padden, at the Grand Crossing station, on October 10, but did not remember testifying that a man came into her store who had a sore neck and bought a can of soup and a loaf of bread. He had no sore neck and she did not say that. He bought bread and Campbell's soup. He asked for a third item, which she could not remember. It was not true that she said at that time that she did not positively identify the man who first came into the store, and it was not true that she said at that time that this man came in first, purchased a can of soup and a loaf of bread and walked out and shortly afterward Allman and Frank Wilson came in.

The evidence of the prosecution, if true, was sufficient to sustain the verdict of guilty. The evidence for the defense, if true, was sufficient to establish the alibi. The credibility of the evidence was a question for the determination of the jury, and the court is not authorized to set aside their verdict if reached as the result of a fair trial. The evidence is not, however, so conclusive of the defendant's guilt as to justify the affirmance of the judgment where the conduct of the trial has been such as to lead to the conclusion that the trial did not result in a fair consideration of the defense of the plaintiff in error. The

instructions do not appear in the bill of exceptions and there is no complaint of them. There are no adverse rulings in regard to the evidence which we consider of sufficient importance to require a reversal of the judgment.

Complaint is made that the prejudicial conduct and remarks of the judge were such as to manifest to the jury his belief in the plaintiff in error's guilt and to prevent him from having a fair trial. At the beginning of the trial the court, after making a general statement of the case to the jury and asking if any of the jury knew the prosecuting witness, the defendant or his attorney, or any reason why he could not try the case fairly and impartially, asked of the assistant State's attorney, "Do you take the jury, Mr. Bellows?" and was answered, "Yes, I do; I will tender them." The defendant's attorney then proceeded to examine the jurors, and the following occurred:

Mr. Heth: "You gentlemen believe in law enforcement, don't you?

The court: "What did you ask them?

Mr. Heth: "I asked them if they believe in law enforcement.

The court: "Well, if they did not believe in law enforcement I would not allow them in here. Anybody that does not believe in law enforcement they are in the wrong pew. Do you want people that do not believe in law enforcement? You represent the defendant, don't you?

Mr. Heth: "Yes.

The court: "Why don't you ask them if they really believe in eating. You might as well. Don't ask such questions.

Mr. Heth: "As a rule, the State's attorney asks each and every juror if they believe in law enforcement.

The court: "They won't ask it in this court. Every citizen believes in the enforcement of law unless he himself is a hold-up man or a burglar, and I don't believe you or any of you gentlemen are burglars.

A juror: "No.

The court: "These jurymen have been asked this question so often—this question of reasonable doubt, presumption of innocence, burden of proof—and they know all about it. Don't you, gentlemen?

Mr. Heth: "You have served on a criminal jury before, all of you gentlemen, I take it?

A juror: "Yes, sir.

Mr. Heth: "What I was about to say, gentlemen, was this: You understand that if the facts in this case warrant it, it is just as much your duty to acquit the defendant as it is to convict him? You understand that, don't you?

A juror: "Yes, sir.

Mr. Heth: "As the court has explained, you have heard these questions asked over and over again. I am not going to take much time in asking you questions. Now, you will give this defendant the same fair and impartial trial as if you were placed on trial for the same offense, wouldn't you? That is all we want—is a fair and impartial trial.

The court: "Yes, you have told them that before, and I think they know it by this time. Swear the jury to try the issues.

"To which ruling of the court the defendant by his counsel then and there duly excepted. Whereupon the jury was sworn to try the issues in the above entitled cause."

The whole incident indicates the impatient temper of the judge at the time. The record contains many exhibitions of the same impatience, lack of restraint and fretful, offensive and disrespectful treatment of the defendant's counsel. The questions, "Do you want people who do not believe in law enforcement? You represent the defendant, don't you?" carry the implication that the defendant, being guilty, wanted jurors who did not believe in law enforcement, and should not have been asked by the judge.

The only material questions in regard to which the evidence in the case conflicts are the identification of the plain-

tiff in error and his alibi, and the only testimony for the prosecution on these questions was that of Mrs. Halliday, the complaining witness. She was contradicted not only by the plaintiff in error and his convict brother as to the presence of the plaintiff in error at the time the crime was committed, but by his mother as to her statements in regard to the affair immediately after the crime was committed. On the alibi the only evidence covering the time of the robbery was the testimony of the plaintiff in error and his mother, which was contradictory of that of Mrs. Halliday. The credibility of these three witnesses was the vital question in the case and it was the province of the jury to decide it. It should have been left to the jury without any manifestation from the judge of his feeling as to the guilt or innocence of the plaintiff in error. The trial was short and throughout it but one objection was made by the State's attorney, and that one was immaterial, but the judge interrupted the counsel for the plaintiff in error more than a dozen times in his examination and cross-examination of witnesses, not only to make rulings that questions not objected to were improper, but to rebuke the attorney in a peevish manner, and sometimes in threatening language, for asking the questions. Mrs. Halliday was the first witness examined, and after she had testified in chief, with no objection, she stated on cross-examination that she did not say to Mrs. Wilson, when Mrs. Wilson came to see her, that the police officers told her that if she did not say that the man that came into her store to buy the soup was Ted Wilson they would not give her any more protection. The abstract proceeds:

Mr. Heth: "Are you sure about that?

The court: "Yes; she said so.

The witness: "I am sure. I saw a gun on Frank Wilson. He had his gun out and Allman pressed his gun against my body.

Mr. Heth: "Did you see Ted Wilson have a gun?

The court: "She said he had none.

Mr. Heth: "I beg pardon. I did not hear her say that.

Mr. Heth: "Ted Wilson took no part in the robbery except to come in—

The court: "Now, wait a minute. What do you mean 'took no part in the robbery?'

Mr. Heth: "Well, I understood her to say—

The court: "The jury will determine, under the law, if he did. (To which ruling of the court the defendant by his counsel then and there duly excepted.)

The witness: "Ted Wilson just came in the store and bought the groceries. That was his part in it. That is all I saw. I left him in the store and I was taken back. I gave him his change—fifty-four cents. I gave him change for a dollar. He bought three items, but I cannot remember the second. I know the sale was thirty-four cents.

Mr. Heth: "He just stood there and did nothing? After that you were taken back in the store?

The court: "What do you mean by 'did nothing?'

Mr. Heth: "Well, I assume he did nothing. She said he did nothing.

Mr. Bellows: "The witness said he waited on the trade, your honor.

The court: "Do you know of your own knowledge that he did wait on the trade?

The witness: "Well, I had customers, but I couldn't be positive. I wasn't there. I couldn't see him wait on the trade when I was in the back.

The court: "Which one was it that said to the defendant, 'Wait on the trade?'

The witness: "Allman.

The court: "Did the defendant say anything when he said, 'Wait on the trade?'

The witness: "No, sir; he did not answer.

The court: "When did you first learn that this defendant and the other Wilson were brothers?

The witness: "When I went to the police station."

The abstract shows the testimony of the plaintiff in error, as follows:

The witness: "My name is Theodore Wilson.

Mr. Heth: "Where did you live prior to the day you came to jail? Oh, by the way, where do you reside now?

The court: "He is in jail.

Mr. Heth: "And how long have you been in jail awaiting trial?

The court: "As it makes no difference how long he has been in jail, the jury has got nothing to do with that.

The witness: "At the present time I reside in the county jail, and prior to that I lived at 713 West Fiftieth street, where I boarded with Mrs. Bergamin.

Mr. Heth: "How much did you pay her a week for board?

The court: "What difference does it make how much he paid her a week? What has that got to do with this lawsuit—how much a week he paid her for board?

The witness: "I lived at 713 West Fiftieth street about one and one-half years with Mrs. Bergamin. I have been a truck driver for six years, employed by Consumers Company. I went to live with Mrs. Bergamin in March, 1926, and lived with her about one and one-half years, until I was arrested.

Mr. Heth: "Calling your attention to the third of October, 1927, will you tell the court and jury where you were on that particular day?

The court: "At 9:00 o'clock in the morning. All right. Proceed.

The witness: "On October 3, I was at 713 West Fiftieth street, where I roomed and boarded with Mrs. Bergamin. I was sick at the time I went to stay with her. I got up

about seven that morning and went to the poolroom. After I went to the poolroom I took a bath and went back to bed. I saw Mrs. Bergamin that morning.

The court: "Is this the place where you were arrested?

A. "Yes, sir.

The court: "The officer said 709, as I understood him, West Fiftieth street.

The witness: "About one-half or three-quarters of an hour after I went to bed I got up and called my mother on the telephone. That was a little after 8:00, or 8:00 o'clock.

Mr. Heth: "What did you say to your mother?

The court: "Now, don't you know any different than that? If you don't, you ought to. Why do you ask such questions?

Mr. Heth: "Well, I don't know.

The court: "Well, you should know it. You shouldn't ask that kind of question—what did he say to his mother. (To which ruling of the court the defendant by his counsel duly excepted.)

Mr. Heth: "Well, you had a conversation with your mother on the telephone and you called her about 8:00 o'clock that morning. Is that right?

The court: "That is what he has told you. Now, how far is 709 West Fiftieth street from 1353 West Seventy-ninth street?

A. "I guess it's about three miles, your honor.

The witness (continuing): "My mother came down to me with some underwear and a clean shirt and left me with two dollars. She got there about 8:45 or 9:00 o'clock. She sat down and talked to me; asked me how I was feeling; gave me the stuff and left about 11:30, I think. I worked for the Consumers Company six years, my reason for quitting being that I was sick. I had kidney trouble. When my mother left, Miss Estes came in—a woman downstairs—and she asked me how I was.

The court: "Now, don't tell what Miss Estes asked you.

The witness: "I don't know whether Miss Estes is here to-day or not. My mother came back again that night around 8:00 o'clock with my sister, Mrs. Kennedy.

Mr. Heth: "How long did they stay?

The court: "What has that got to do with it? What has it got to do with whether they came at 8:00 o'clock that night? · What has that got to do with this case? Well, how is it important?

Mr. Heth: "I want to show as to the time he was arrested. I want to bring that out.

The court: "Well, ask him what time he was arrested. (To which ruling of the court the defendant by his counsel duly excepted.)

The witness: "I was arrested about 10:30 that night. My mother and sister were there at the time. Just before I was arrested I went up to the corner for the morning paper and a cigar.

The court: "What has that got to do with the case, thirteen hours after the alleged robbery? What has that got to do with the case? Now, tell me if it has any bearing on this case. I will be glad to let it in, but tell me what has it got to do with this case?

Mr. Heth: "I was just trying to lead up to the time of the arrest, your honor, and show the circumstances under which he was arrested.

The court: "Sustained. (There appearing in the record no objection by the State's attorney calling for a ruling of the court.)

The court: "The circumstances—

Mr. Heth: "Under which he was arrested; yes.

The court: "Well, ask him if there is anything about the arrest. Ask him.

Mr. Heth: "You got back there about what time?

The witness: "I got back in about five minutes. I was only out about five minutes.

Mr. Heth: "When you got back what happened?

The witness: "I threw my coat behind the settee—

The court: "No, no. I am not going into any such situation at all. I am not going to have in anything he did at 11:30 at night. I cannot see the significance in it. Let's try this case on the issues. (To which ruling of the court the defendant by his counsel then and there duly excepted.)

The witness: "The police officers came into my home and arrested me. I was in the police court before Judge Padden on October 10. Mrs. Halliday and Mrs. Norman were both there.

The court: "Were all three defendants tried at the same time?

A. "My brother—

The court: "It was your brother, was it?

A. "Yes.

The court: "And the other man tried at the same time in the police court?

A. "Yes, sir.

The witness: "I heard Mrs. Halliday then and on the stand to-day. Then she testified that 'a man that looked like Ted Wilson, I am not positive, came into my store and bought a can of soup and a loaf of bread, paid for it and walked out; he had a sore neck.' About two or three minutes later Frank Wilson and Joe Allman came in and held her up. Margaret Norman was also present in court and I heard her testimony.

Mr. Heth: "And Margaret Norman testified at that time—

The court: "Now, I am not conducting a law school here. Now, are you asking him what she said? I don't know where you lawyers over here in the criminal court get your law from. What do they do—just let anybody ask any questions they want to?

Mr. Heth: "I am trying to make a record. I realize my duty.

426

The court: "No, I realize your duty is to try the case with evidence.

Mr. Heth: "I feel those remarks of the court are prejudicial, and I want at this time on account of these remarks, your honor, to have the case continued. I ask that a juror be withdrawn and the case be continued.

The court: "At any time I ask you to ask proper questions it seems to have no effect on you. The jurors will understand that, or anything the court says, that the court expresses no opinion as to the credibility or the lack of credibility of any witness in the case. What the court says to counsel must in no way influence you gentlemen in arriving at a verdict. (To which ruling of the court the defendant by his counsel then and there duly excepted.)

The witness: "I did not go into the store of Mrs. Halliday on the third day of October, at about 9:10 in the morning, and make a purchase. I was not near the store—never saw it. I had nothing to do with the perpetration of this offense.

Mr. Heth: "Did you conspire, aid or abet or in any way help or assist—

The court: "Well, he said he was not there and didn't know anything about it, and that covers it.

Mr. Heth: "But, your honor, he might have had something to do with conspiracy. He might have had something to do with aiding or assisting these men, and that is the question I am asking him.

The court: "The State claims, not that he was not present, aiding, assisting or abetting, but that he was there. (To which ruling of the court the defendant by his counsel then and there duly excepted.)

The witness: "I had nothing to with the robbery—had no part in it.

The court: "He wasn't there, knows nothing about it."

On cross-examination:

Mr. Piggott: "When was the last time you worked?

The court: "Mrs. Halliday, did these men have any covering over their faces?

Mrs. Halliday: "No, sir; none."

In the examination of Frank Wilson the abstract contains the following:

The witness: "Allman and I plead guilty and were sentenced to the penitentiary, and I was brought back to testify for my brother.

Mr. Heth: "And your brother has maintained he is innocent, has he?

A. "He is innocent.

The court: "Now, if you ask a question like that again, sir, I will have to make a ruling against you that you don't like. Now, you take an exception. I want it understood if you do not know the rules of evidence you must not try cases here. The idea of asking such a question! 'Your brother has maintained he is innocent!'

Mr. Heth: "My reason, your honor, for it is—

The court: "I don't want to know your reason. Don't you do that again in this court, sir. Don't you dare do it again or I will not let you go on with this case. (To which ruling of the court the defendant by his counsel then and there duly excepted.)"

In the testimony of Mrs. Bergamin, in whose house the plaintiff in error was living, the abstract shows the following:

The witness: "I saw Theodore on the morning of October 3. I know the day, because Sunday was my mother's birthday and I went to South Bend. I saw him at 7:00 o'clock, when I left for work.

The court: "Now, what has that got to do with 9:30 when she saw him there at 7:00? Will you please tell this jury what that has got to do with it?

A. "At 5:30 that night, when I returned from work, he was sitting on the bed on the back porch.

Mr. Heth: "What did he say to you and what did you say to him?

The court: "No; I have always understood for about forty years and more that evidence of this kind has never been tolerated for a moment in any court, but here you come and insist on asking those kind of questions, and I have asked you several times not to ask those questions but you insist on doing it.

Mr. Heth: "Your honor, this conversation between this man and this woman here. She said she saw him at 7:00 o'clock in the morning.

The court: "What law book on evidence did you ever read in your studies of the law that ever suggested that any such evidence could be possibly admissible?

Mr. Heth: "I don't see how it is hearsay.

The court: "A conversation between this lady and the defendant and you, you put her on the witness stand and you think it is admissible. Go on. Ask another question. (To which ruling of the court the defendant by his counsel then and there duly excepted.)

The witness: "He left me in March, 1927, and I did not see him any more until September.

Mr. Heth: "And what time in September did he come to see you?

The court: "Will you tell me what this has got to do with this case? I don't know why you are asking these questions. (To which ruling of the court the defendant by his counsel then and there duly excepted.)

Mr. Heth: "Do you know what his condition was when he came to see you?

Mr. Piggott: "That is objected to.

The court: "Are you a doctor? Ask her if she knows what his condition was. You may ask her.

Mr. Heth: "You saw him at 7:00 o'clock, did you?

The court: "She has already told you that.

Mr. Heth: "That is all."

These copious citations from the abstract, which include one-third of its contents, have been necessary to show the attitude and manner of the judge and the extent to which he assumed the conduct of the trial on behalf of the prosecution. His discourteous treatment of the defendant's counsel throughout the trial; his constant, peevish, hectoring and censorious berating of him; charging him with ignorance of the rules of evidence; asking him what law book on evidence he had ever read which suggested that such evidence as he offered could possibly be admissible; interrupting him when he began to state his reason with the statement, "I don't want to know your reason. Don't you do that again in this court, sir. Don't you dare do it again or I will not let you go on with this case;" volunteering the remark when the defendant stated, "I had nothing to do with the robbery—had no part in it," "He wasn't there, knows nothing about it;" saying he was not conducting a law school, and when counsel said, "I am trying to make a record; I realize my duty;" "No, I realize your duty is to try the case with evidence," clearly implying that counsel was attempting to try the case without evidence,—all plainly indicated to the jury the opinion of the judge as to the merits of the defense. There were constant interruptions by the judge, impatient, fault-finding remarks, disparaging to counsel and unnecessary to any ruling, and objections interposed where none were made by counsel. The jury could not have failed to note the hostile attitude of the court to the defense. Counsel for the defense, feeling the prejudicial character of the court's remarks, asked to have a juror withdrawn and the case continued, but this was refused, the court remarking, "At any time I ask you to ask proper questions it seems to have no effect on you. The jurors will understand that, or anything the court says, that the court expresses no opinion as to the credibility or the lack of credibility of any witness in the case. What the court says to counsel must in no way influence you

gentlemen in arriving at a verdict;" and the judge continued throughout the trial the same course of disparagement of counsel and of the defense. The impression conveyed to the jury by the disparaging conduct of the judge could not be so easily effaced, and they were much more likely to be influenced by the actions of the judge and the feeling manifested in his repeated words and rulings during the trial than by these words thus directed to them.

"This court has had occasion several times to consider the remarks and conduct of trial judges, and has said that a considerable latitude must be allowed in asking questions to enable the judge to give a proper ruling but has emphatically disapproved of anything which would tend to influence the jury in determining the facts. It has been said that a judge should exercise great care to avoid giving expression to any thought that would be calculated to lead the jury to infer that his opinion was in favor of or against the defendant in a criminal case." (*People* v. *McMullen*, 300 Ill. 383.) "One of the first purposes of orderly administration of the law is that a defendant, whether guilty or innocent, shall be accorded a fair trial. The fact that the judge may consider the accused to be guilty in nowise lessens his duty to see that he has a fair trial." *People* v. *Rongetti*, 331 Ill. 581.

The case was an exceedingly close one, and in the sharp conflict of the evidence it was highly important that the jury should consider the case unhampered by any intimation from the court in disparagement of the defense. In view of this record we do not think the verdict can be said to be the result of the fair trial to which every person accused of crime, whether guilty or innocent, is entitled.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*