## GOLDSTEIN v. UNITED STATES. *
### No. 9559.

Circuit Court of Appeals, Eighth Circuit.
Feb. 15, 1933.

Patrick H. Cullen, of St. Louis, Mo. (Abbott, Fauntleroy, Cullen & Edwards and Verne Lacy, all of St. Louis, Mo., on the brief), for appellant.

Bryan Purteet, Asst. U. S. Atty., of St. Louis, Mo. (Louis H. Breuer, U. S. Atty., of Rolla, Mo., and Cornelius J. Stattler, Asst. U. S. Atty., of St. Louis, Mo.; on the brief), for the United States.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

SANBORN, Circuit Judge.

The appellant was the defendant in the court below, and will be so designated in this opinion. He was the president and in control of the Fulton Fur Company, which was for several years engaged in the business of buying and selling furs at St. Louis, Mo. In order to induce trappers and traders to

send their furs to him, he mailed out price lists and literature throughout the St. Louis trade territory, and did a considerable business during the latter part of 1929 and the early part of 1930. Complaints were made that his treatment of shippers did not square with the representations and promises contained in his circulars and price lists, and he was indicted for using the mails in furtherance of a scheme to defraud, under section 215 of the Penal Code, U. S. C., title 18, § 338 (18 USCA § 338).

The indictment contained six counts, each count charging the same scheme, but a separate use of the mails. The scheme was described as one to obtain the money and property of persons engaged in raising, trapping, and hunting fur-bearing animals and shipping furs. The pretenses, representations, and promises which it was charged were false were in substance as follows: That the defendant, through the Fulton Fur Company, would remit checks for shipments within eight hours of the receipt of furs; that he would hold shipments separate until the shippers had received the company's offer therefor; that he would give better service and better values for furs than other fur dealers; that furs shipped to him would receive a better grading and a higher market value than if shipped to other dealers; that shippers would, in all instances, get the benefit of any doubt as to grades; that slightly unprime skins would be classed as prime; that year after year shippers to the defendant were satisfied; that the defendant employed expert graders who watched for large and extra fancy dark skins; that he would personally pledge fair and honest grading of furs; that the prices offered in his price lists sent to shippers were higher than the regular market prices and higher than those quoted by other reputable dealers; and that the defendant would give better grading and better prices than other reputable dealers.

The defendant entered a plea of not guilty to the indictment, and was tried. The government produced some thirty witnesses. Five of them were persons named in the various counts of the indictment (except the second count) as persons who had dealt with the defendant through the mails. Eleven of the government's witnesses testified as to having shipped furs to the defendant. Two post office inspectors testified as to admissions of the defendant and as to the interception and inspection of certain shipments mailed to the defendant. Three of the witnesses testified as to the character and value of the furs in the intercepted shipments, and nine testified as to the use of the mails.

The evidence of the government tended to show that the defendant did not always remit within eight hours for furs received; that he did not always hold shipments separate; that he did not grade prime furs as prime; that he did not pay the highest market value for furs or give the highest grades to which furs shipped to him were entitled; that he did not pay the prices contained in his price lists; and that, in conducting his business, he used the mails as charged in the indictment.

The evidence of the defendant tended to show that there was no wilful delay in the remittance of money; that at least ninety-five per cent. of the remittances were made the same day the furs were received; that he held shipments separate when requested to do so; that if there was any failure to hold separate, it was due to failure on the part of the clerk who attended to such matters; that he employed a trained expert fur grader who, as furs were received, announced the grades, and the prices according to the defendant's price lists, and that the defendant listed them as announced by the grader and remitted accordingly; and that the prices paid were all that the furs were reasonably worth.

The government dismissed the second count of the indictment.

A motion for a directed verdict in favor of the defendant was made at the close of the government's testimony and at the close of all the testimony. These motions were denied. At the close of the government's case, a motion was made to treat certain portions of the indictment as surplusage, and that motion was denied. The jury found the defendant guilty upon all the counts of the indictment (except the second), and he was sentenced to five years in the penitentiary. From this judgment and sentence he has appealed.

The defendant specifies a number of errors, which may be classed under four heads: (1) Those which relate to the indictment; (2) those which relate to the conduct of the court; (3) those which relate to rulings upon evidence; (4) the sufficiency of the evidence. The errors specified will be discussed in that order.

1. With reference to the indictment, the defendant contends that "the Court erred in overruling the defendant's motion praying that certain parts of the indictment be treated as surplusage and withdrawn from consideration by the jury."

612

As has been stated, this motion was made at the close of the government's case. The defendant asked that the court treat as surplusage the following allegations of the indictment: (1) that the defendant did not remit for furs within eight hours; (2) that the shipments were not held separate; (3) that the defendant did not give better service and better values than were offered by other reputable dealers; (4) that the defendant did not maintain a fixed standard of grading furs, and would not and did not pay the highest market value for furs shipped; (5) that the defendant did not maintain expert fur graders. Upon the argument of the motion, the court expressed the opinion that some of these matters standing alone would constitute mere puffing, but that he would deal with them in his charge to the jury. In making the motion, the defendant evidently relied upon certain language of this court, which appears in the case of Beck v. United States, 33 F.(2d) 107, 110, with reference to surplusage in the indictment. In that case, we said: "This situation can be remedied by the court, upon proper motion sufficiently in advance of the trial, determining what misrepresentations the defendant will be required to meet on the trial."

■ The proper motion would be a demand for a bill of particulars. Where a defendant desires to be informed, before entering upon the trial, what particular parts of an indictment will be relied upon as bringing the case within the statute, he may apply for a bill of particulars, which the court, in the exercise of a sound legal discretion, may grant or deny as the ends of justice require. Rosen v. United States, 161 U. S. 29, 35, 16 S. Ct. 434, 480, 40 L. Ed. 606; Cochran v. United States (C. C. A. 8) 41 F.(2d) 193, 198; Chew v. United States (C. C. A. 8) 9 F.(2d) 348, 353; Rimmerman v. United States (C. C. A. 8) 186 F. 307, 310; Rinker v. United States (C. C. A. 8) 151 F. 755, 759; Salerno v. United States (C. C. A. 8) 61 F. (2d) 419, 421.

So far as we are aware, there is no method of compelling the court, in the midst of a criminal trial, to advise counsel what portions of the indictment he regards as surplusage, and the refusal of the court to grant such a motion as was made in this case is not reversible error.

■ Surplusage in an indictment consists of allegations of matter wholly foreign and impertinent to the cause, unnecessary averments, or allegations without which the pleading would yet be adequate. Mathews

v. United States (C. C. A. 8) 15 F.(2d) 139, 142. See United States v. Noveck, 271 U. S. 201, 46 S. Ct. 476, 70 L. Ed. 904.

■ Mere surplusage in an indictment may be disregarded, and in a case such as this, where a number of false representations are alleged tending to establish the existence of the scheme, it is not necessary for the government to prove all of the false representations charged if proof of a lesser number lays a sufficient foundation for a finding by the jury that the scheme was in fact devised. Mathews v. United States, supra. See, also, Hall v. United States, 168 U. S. 632, 639, 18 S. Ct. 237, 42 L. Ed. 607; Goto v. Lane, 265 U. S. 393, 44 S. Ct. 525, 68 L. Ed. 1070; United States v. Noveck, supra; Silkworth v. United States (C. C. A. 2) 10 F.(2d) 711, 715. What the defendant will be called upon to meet will depend upon the state of the evidence when the government rests.

■ It is apparent that, if a defendant does not see fit to apply for a bill of particulars in advance of a trial, he can save for review the question as to whether certain allegations in the indictment are surplusage, in several ways: He may object to all evidence tending to prove the allegations at the time the evidence is offered; he may move to strike out all such evidence if received; at the close of all the evidence he may ask the court to instruct the jury to disregard the surplus allegations and except to the denial of his request; and he may except to the charge of the court submitting to the jury for their consideration such allegations. It is apparent that the rights of the defendant can be fully protected without requiring the court to rule upon such a motion as was made in this case.

2. The record indicates that the trial lasted for about six days. During that time the court and counsel for the defendant were not always able to agree as to the proper application of certain of the rules of evidence, and the court made remarks in connection with his rulings which the defendant contends were prejudicial.

From among these remarks, we quote the following:

"He (the witness) would not know it, and you (counsel for defendant) know he would not know it."

"It would be hearsay. You know it is not competent. You must stop that. I am not going to stand for it much longer."

"Oh, yes. He could not know it by any rule of evidence that is competent. It would

be hearsay, and it is an improper question, anyway."

"That is twice, now, that I have passed on similar matters. I hope I do not have to pass on them a third time."

"If you withdraw your objection, you may do so, but I will not permit you to take an inconsistent position, blowing hot when it is in your favor, and cold when it is against you."

"You have hardly asked a question this morning * * * that was not leading."

"You cannot take witnesses and put a ring in their noses and lead them around like pet bears."

"It is not only hearsay * * * but worse than hearsay, and it is getting inferentially the testimony by men who are scattered all over the country, which you cannot do. I am not quite sure you knew it could not be done."

"I would not believe any court that would say a thing like that."

"They have not been offered yet, and I could not guess, not being the son of a seventh son, whether you intended to offer them."

The question which we are called upon to decide is whether these remarks during the progress of the trial were actually prejudicial to the defendant. In his oral argument, counsel for the defendant stated that he felt that they did his client no good. The question is whether they actually did his client any harm. They were not directed at the defendant nor to the jury, and there was nothing about them which indicates to our mind that the court had the slightest prejudice against the defendant or intended to injure his case.

The defendant relies largely on the case of Sunderland v. United States, 19 F.(2d) 202, a decision by this court. In that case, it was said (page 216): "The term 'fair trial' is often used, but not often defined. It is of broad scope. While we shall not undertake to give a formal definition of the term, yet it may not be amiss to mention, in part at least, its content. * * * It means a trial before an impartial judge, an impartial jury, and in an atmosphere of judicial calm. * * * Being impartial means being indifferent as between the parties. * * * It means that, while the judge may and should direct and control the proceedings, and may exercise his right to comment on the evidence, yet he may not extend his activities so far as to be-

come in effect either an assisting prosecutor or a thirteenth juror."

It is not always possible during the trial of a hotly contested case for a judge, however impartial he may be, to maintain in the courtroom that atmosphere of complete judicial calm which is so much to be desired. We must not overlook the fact that the human element cannot be entirely eliminated from the trial of lawsuits. While counsel owe to the court, because of the position which he occupies, the utmost deference and respect, and while the court owes to them an equal obligation of courtesy and patience and consideration, nevertheless sharp differences of opinion do arise in the heat of trial and things are said which were better left unsaid. Such incidents are often regarded as trivial during the trial of a case and are quickly lost sight of, but, when set forth in the record and emphasized by counsel on appeal, they take on an importance which they never actually possessed. It is impossible to gather from the cold record, particularly when it is in narrative form, the atmosphere of the trial itself, the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy. Critical remarks of the court frequently cut both ways, if they cut at all. Colloquies between counsel and colloquies between the court and counsel as to the rules of evidence are not ordinarily regarded by a jury as serious matters or of much concern to them. An appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage the defendant in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits.

The cases dealing with alleged misconduct of trial courts are not particularly helpful. In the following cases judgments were reversed on the ground that remarks which were made constituted prejudicial error: Sunderland v. United States (C. C. A. 8) 19 F.(2d) 202; Withrow v. United States (C. C. A. 4) 1 F.(2d) 858; People v. Wilson, 334 Ill. 412, 166 N. E. 40; State v. Coss, 53 Or. 462, 101 P. 193; Egan v. United States, 52 App. D. C. 384, 287 F. 958, 971. See note in 42 L. R. A. (N. S.) 434. Among cases holding that remarks of the court were not prejudicial are: Hargrove v. United States (C. C. A. 8) 25 F.(2d) 258, 261, where the trial court had said: "Now there is a respectful way to take exceptions in this court.

You know it." This court said: "This language on the face of the printed record seems uncalled for; but, as was freely conceded in argument, we cannot visualize the courtroom scene nor properly impute reversible error to language no more essentially prejudicial than that quoted. It is to be read in connection with the entire procedure in the course of which it was uttered."

Jefford v. United States (C. C. A. 8) 31 F. (2d) 908, 910. The objectionable language there was: "You don't claim, do you, that the evidence is insufficient as you have produced to make out a case, without bolstering it up with something that happened years ago?" Moore v. United States (C. C. A. 7) 2 F. (2d) 839. Magen v. United States (C. C. A. 2) 24 F. (2d) 325, 329, in which it was said: "To hold that a personal altercation, having no real relation to the merits of the litigation, causes a mistrial, would be to reward a defendant for the shortcomings of his lawyer in a case where it is mere speculation to say he suffered any prejudice."

Gridley v. United States (C. C. A. 6) 44 F. (2d) 716, 736. Myers v. Town of Guntersville, 21 Ala. App. 559, 110 So. 52, where the remark was: "You have asked that enough; you just want to drag them around from first one thing to another." People v. Connors, 77 Cal. App. 438, 246 P. 1072, 1079, where the court had said: "Make your objection; don't take up so much time in statements." People v. Knocke, 94 Cal. App. 55, 270 P. 468, 470, where the remarks complained of were: "I am surprised that any one who has gotten by the Bar Association examination should raise that question;" and: "Now wait. If you cannot behave yourself in this court, you better go and practice in the police court. Make your motion in a quiet manner." Of these remarks, the appellate court said: "Under the strain of a trial and the repetition of an offense, even trial judges are not always able to choose their diction with the nicety of a Field or Marshall." People v. Lockhart, 242 Mich. 491, 219 N. W. 724, 725, in which the objectionable remark was: "I am glad to have you make objections, if there is some good sense back of them, if they are proper objections. You are a lawyer; you know what impeachment is; you ought to know it by this time." In Hein v. Mildebrandt, 134 Wis. 582, 115 N. W. 121, 124, the Supreme Court of Wisconsin said: "The language complained of was an admonition coming from the court to the effect that after the court had ruled twice with reference to a certain question it was unprofessional and uncourteous for appellant's counsel to persist in putting the question for the purpose of procuring an answer considered improper by the court, and that counsel had the record covering the point completely, and that he must not offend in that way again."

Further cases are to be found in the note to 42 L. R. A. (N. S.) 430.

Since the enactment of section 391, title 28, U. S. C. (28 USCA § 391), an error is not presumed to be prejudicial. The burden of showing prejudice is upon the appellant, and he is not entitled to the reversal of a judgment or conviction unless it appears that he has been denied some substantial right and has been thereby prevented from having a fair trial. Rich v. United States (C. C. A. 8) 271 F. 566; Trope v. United States (C. C. A. 8) 276 F. 348; Hall v. United States (C. C. A. 8) 277 F. 19; Hermansky v. United States (C. C. A. 8) 7 F. (2d) 458, 460; Furlong v. United States (C. C. A. 8) 10 F. (2d) 492; Miller v. United States (C. C. A. 8) 21 F. (2d) 32; Horning v. District of Columbia, 254 U. S. 135, 139, 41 S. Ct. 53, 65 L. Ed. 185; Salerno v. United States (C. C. A. 8) 61 F. (2d) 419, 424.

A reading of the entire record in this case indicates to our minds that the remarks complained of were not intended or calculated to create in the minds of the jurors a prejudice against the defendant. As between the actual parties, the court maintained an absolute impartiality. His charge was eminently fair. No exception was taken to it by the defendant, except in an unimportant particular which is not assigned as error. The court instructed the jury to disregard remarks made by court and counsel in connection with rulings on evidence. We think that the remarks complained of did not prevent the defendant from having a fair trial.

3. The defendant argues that the court erred in not permitting Mr. Montgomery, a witness for the government, to identify what was referred to as the "Abraham quotations" (Defendant's Exhibit 21), a price list of another fur dealer.

The record indicates that the exhibit had been identified by Abraham. Montgomery was being cross-examined by counsel for the defense. He was asked this question: "I show you 'Defendant's Exhibit 21' and ask if that is not Abraham quotation for the State of Illinois, for the month of January, 1930?"

He answered: "It so states. I would not know it. I didn't print it."

"Q. You are familiar with it, are you not?"

The court stated that the question called for hearsay.

Thereupon this question was asked the witness: "Have you not become familiar with, and have you not on file the price-lists issued by Abraham & Company for the year 1929?"

Objection was interposed and sustained. The defendant in his brief says that the court denied him the right to prove this exhibit. This statement appears to be in conflict with the record. However that may be, in the absence of an offer of proof, the ruling of the court is not reviewable. Cropper v. Titanium Pigment Co., Inc. (C. C. A. 8) 47 F.(2d) 1038, 1042, 78 A. L. R. 737.

The defendant claims that the court erred in excluding certain exhibits consisting of written communications from customers. In respect to these the following offer was made: "We offer to identify numerous letters received by the Fulton Fur Company during the period of 1929, and then to offer said letters in evidence. The said letters so offered are here in Court and, in the judgment of counsel, they contain statements endorsing the prices which they had received for their goods and stating that they were satisfactory."

The objection to this offer was sustained and the letters excluded.

It appears from the record that the exhibits excluded consisted of 302 letters purporting to have come from satisfied customers. The defendant contends that these were admissible "as part of the res gestæ," and relies mainly on Hibbard v. United States (C. C. A. 7) 172 F. 66, 18 Ann. Cas. 1040, wherein it was held that thirteen file wrappers of correspondence containing the entire record of the defendant's business were admissible upon his trial for fraudulent use of the mails. The court said (page 70): "The elementary rule in reference to hearsay testimony, cited in support thereof, is inapplicable to either of the tenders of file wrapper contents. While it is true that the applications and correspondence thus appearing are incompetent to prove that facts existed as therein stated, they were expressly produced and offered for another purpose, well recognized for their admissibility under the rules of evidence. In connection with the testimony of the witness Edmondson, the initial exhibits were admissible (as offered) by way of illustration; and the subsequent tender of the 13 cases, alleged to contain the record of the entire course of business, became admissible as original evidence of the nature of res gestæ."

[11] If the fact that the defendant had in his possession 302 letters from satisfied customers had any tendency to disprove the charges contained in the indictment in this case, they should have been received, but obviously as to all of the statements contained in them they were pure hearsay. These letters would be no more competent to establish the innocence of the defendant than letters from dissatisfied customers would have been to establish his guilt.

This court has said: "In the investigation of charges of fraud the latitude of inquiry is wider than is allowed in many other cases. This is so because the intent of the parties necessarily involved in a charge of fraud is a mental condition and provable by a variety of acts, declarations, and facts which are often incompetent in the trial of other issues. But this latitude of inquiry does not justify a disregard of the rules of competency or relevancy." Lemon v. United States, 164 F. 953, 959. And also: "In cases involving schemes to defraud the courts very properly allow a wide latitude in the admission of evidence for the prosecution, for it is only in this way that fraud can usually be established. The defendants are called upon to meet this situation and are entitled, within reasonable limits, to show good faith and honest intent." Gould v. United States, 209 F. 730, 739.

Letters written by one defendant to another, tending to show good faith at the time of the alleged scheme, are admissible as part of the res gestæ. Gould v. United States, supra; Patterson v. United States (C. C. A. 6) 222 F. 599, 649, certiorari denied, 238 U. S. 635, 35 S. Ct. 939, 59 L. Ed. 1499.

It has also been held that testimonials of users of a defendant's product, attributing to it certain qualities, are, when proven to have been relied upon in good faith by the defendant in making his representations as to the character of his goods, admissible as evidence negativing the existence of fraud. "If these letters had related to the statements made, and had been seen by the defendant's manager, and he believed them to be genuine, and in that belief he had put forth the statements in issue, they would have been admissible on the question of intent, without proof of their execution, or of the truth of their subject-matter." Dr. J. H. McLean Medicine Co. v. United States (C. C. A. 8) 253 F. 694, 697. See, also, Harrison v. United States (C. C. A. 6) 200 F. 662,

675; Hair v. United States (C. C. A. 7) 240 F. 333, 336.

There is not in this case any evidence that the defendant relied upon any of the statements made in the letters in 'making his representations and promises. Since the letters were incompetent as evidence of their contents, and the mere fact of their existence did not bear upon the nature or character of the scheme, the use of the mails, or the intent of the defendant, the court was clearly correct in excluding them.

The defendant contends that the court erred in refusing to permit the defendant to prove the prices skins brought in the city of St. Louis during the period of time it was claimed that he was executing his scheme to defraud. This contention is directed to the cross-examination of the government's witness Montgomery, who, on direct examination, had testified that on or about January 22, 1930, he was called to the post office inspectors' office in the Federal building at St. Louis to examine, grade, and value certain shipments of furs to the defendant, which had been opened by the post office inspectors and were submitted to Mr. Montgomery and other fur graders for the purpose of obtaining their opinion as to the grades and values of the skins in these shipments. His direct examination was limited to these particular shipments, the manner in which they were examined, and the grades and prices which were placed upon them. On cross-examination, he stated that the value he placed on these furs was measured by certain quotations for furs for January, 1930, and that in placing the figures he aimed to keep within the limits of the prices quoted. He was asked:

"Q. You sold muskrat, did you not, at auctions?"

His answer was: "Yes, I assume we sold all kinds of furs at auction during that month."

"Q. Eight hundred and fifty muskrats sold at auction here in the City of St. Louis, for two hundred and twenty-one dollars; were there not? * * * A. I don't know it to be a fact. They may have sold eight thousand or ten times that much.

"The Court: I do not think we ought to go into this. It involves a wholly different thing. It involves the question of the origin of those muskrats; what state they came from, what their condition was, and it has nothing but a misleading value in this case. You cannot find out about it until you show the same quality. Nothing is better settled

than that you cannot ask a man whether a farm in the north here—

"Mr. Cullen: Well, I desire to ask the witness this question:

"Q. Take these muskrats: They were piled up in a pile and they came from practically every state in the Union, didn't they?

"Mr. Stattler: I object to that.

"The Court: I think it is objectionable. I think it is misleading, because the quality is not shown. * * *

"Mr. Cullen: My thought is—I can give two reasons, and then I am through with this phase of it—that it is permissible as a matter of cross-examination to test the knowledge and information of the witness; second, I think it is admissible as bearing upon the market value of things here in St. Louis, during the year 1929; especially on or about December 16th, when the defendant is charged with paying too small a price for this kind of goods.

"The Court: But these furs were wholly different. They came in very shortly before the twenty-second day of January, 1930. The sale was in November, 1929. We do not know the class of the goods, the sort they were; whether they were first, second, third or fourth; whether they were large skin or small.

"Mr. Cullen: I want to develop that.

"Mr. Stattler: And whether they were northern—

"The Court: I am going to sustain the objection. You may have your exception, and go to something else.

"Mr. Cullen: I offer to prove sales at the price, at the time indicated. I also offer to prove by this witness that the various skins, such as muskrat, and so forth, that I have inquired about, were collected from substantially every state within the trade territory of St. Louis, piled together and sold in lots ranging from eight hundred and fifty to a thousand in a lot.

"Mr. Stattler: On what date?

"Mr. Cullen: On the twenty-seventh day of November, 1929, and I want to follow that up and show that there were similar sales after that.

"The Court: I am not going into that. You may have your exception."

It is the theory of the defendant that the testimony excluded was material because there was evidence that the fur season of 1929 and 1930 was an unsettled fur season, with prices having a tendency downward,

and that therefore prices received at auction in November, 1929, would bear upon the question of the value of furs during January, 1930.

Mr. Montgomery's direct testimony had been limited to his grading and valuation of particular shipments of furs received in January. The furs about which he had testified were not furs shipped in to be sold at auction. It was not shown that prices received at auction for furs in November, 1929, had any relation to the market prices paid by fur dealers to shippers in January, 1930. Because of the forced aspect of auction sales, the prices brought are sometimes not accepted as accurate measures of market value. In Geddes v. Anaconda Copper Mining Co., 254 U. S. 590, 601, 41 S. Ct. 209, 213, 65 L. Ed. 425, the court said: "As an original proposition, we cannot think that the amount offered for property at a public sale for cash is such a measure of its value that the failure to obtain a bid at such sale for more should be accepted by courts as a sufficient reason for affirming a sale for a price which they found, on other evidence, to be inadequate. In business life forced sales for cash are such a last resort for obtaining money that a sale 'under the hammer' is synonymous with a sale at a sacrifice, and prices obtained at such sales have usually been rejected by courts when tendered as evidence of value."

See, also, In re McAusland (D. C.) 235 F. 173, 190; Hengst v. John B. Carter Co. (D. C.) 235 F. 982, 984; Spear v. City of Bath, 125 Me. 27, 130 A. 507. Such prices have, however, often been held to be competent, but not conclusive, evidence of value. The Columbus (D. C.) Fed. Cas. No. 3,042; Pacific Coast S. S. Co. v. Bancroft-Whitney Co. (C. C. A. 9) 94 F. 180, 190; The Queen (D. C.) 78 F. 155, 172, reversed on other grounds, The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419; Grant v. National Bank of Auburn (D. C.) 232 F. 201, 213; Nogi v. Greenwood (D. C.) 1 F. Supp. 60, 63; Koski v. Haskins, 236 Mass. 346, 128 N. E. 427; Kobic v. Reed, 242 Mich. 594, 219 N. W. 678; Strimling v. Union Indemnity Co., 176 Minn. 26, 28, 222 N. W. 512, and cases; Rosenblatt v. Winstanley (Mo. App.) 186 S. W. 542; Sultan v. London Assurance Corp., 135 A. 58, 4 N. J. Misc. 947; Navarre Hotel & Imp. Co. v. American Appraisal Co., 156 App. Div. 795, 142 N. Y. S. 89; First Nat. Bk. of Strasburg v. Amer. St. Bk. of Brighton, 73 Colo. 254, 215 P. 473.

While we think that the court might well have permitted the cross-examination of the witness with respect to sales of furs at auction, we cannot say that there was error in excluding this testimony. There was no evidence that the skins sold at auction and the skins about which Mr. Montgomery testified were similar in grade or quality, nor was there any offer to show that they were similar. The relation between market prices and prices obtained at auction was sufficiently remote to justify the court, in the exercise of a sound discretion, to refuse to permit the cross-examination of the witness with reference to auction prices. The extent of cross-examination rests largely in the discretion of the trial court. Cropper v. Titanium Pigment Co. (C. C. A. 8) 47 F.(2d) 1038, 1044, 78 A. L. R. 737, supra; Union Trust Co. et al., Trustees, v. Woodrow Manufacturing Co. et al. (C. C. A. 8) 63 F.(2d) 602, opinion filed February 8, 1933.

It is also contended by the defendant that the court erred in permitting shippers residing in states far distant from St. Louis to testify to the grade and price of skins, because the points of shipment were remote and the witnesses were not qualified to testify to market conditions and grades in the city of St. Louis. Government witnesses from Minnesota, Michigan, and other states were permitted to testify that they shipped prime skins to the defendant which were not graded by him as prime and for which they did not receive prices which they would have been entitled to receive according to his lists had they been graded as prime skins. The evidence showed that the defendant sent out price lists for different states. There was nothing in his lists or in his literature which indicated that the word "prime" had any different significance at St. Louis than it did elsewhere or that gradings were any different there than they were generally throughout the country. In fact, the inference, if any, would be to the contrary. Furthermore, there is no evidence indicating that the word "prime," as applied to furs, had any different meaning in Missouri than it had in Minnesota or Michigan, and there is evidence that the word "prime" had the same meaning everywhere to people who dealt in furs. We find no merit in this contention.

4. The defendant argues that he was entitled to a directed verdict. It would unduly prolong this opinion to set out in detail the testimony of the various witnesses produced by the government. The testimony of the shippers called by the government was to the effect that they had had much experience with furs and knew the difference between

prime skins and unprime skins, large skins and small skins, skins which had good fur and those which had poor fur; that they did not receive the grades and prices for their skins which they were entitled to receive from the defendant according to his literature and his price list; that they did not receive the remittances for their furs as promptly as was promised; and that, in one or two instances, furs which should have been kept separate by the defendant were not kept separate. The fact that the defendant had used the mails as charged in the indictment was not disputed.

Mr. W. L. Noah, a post office inspector, testified that he saw the defendant about February 10 or 12, 1930, and had a conversation with him. We quote the following from his testimony: "I told him that we had made a test of certain parcels, fur shipments, addressed to him. I think there were fourteen and thirteen reports had been received. I showed him all the invoices covering these tests that I had in my possession and asked him about each. He stated that he paid all the furs were worth. He stated that he didn't know anything about grading himself; that all his grading had been done by a man named Hugo Wright, and Mr. Wright: if there was anyone that was responsible for an improper grading, it was Mr. Wright and not he. He stated to me that he had offered in his November, December and January price lists, prices for furs that he could not, would not and did not expect to pay at the time the offers were made but that those offers were made for the purpose of inducing the shipper to send the furs to him rather than to his competitors and that he had to quote such prices in order to get the business."

Mr. C. B. Utley, another post office inspector, stated that he had a conversation with Mr. Goldstein at a time when Mr. Goldstein came to his office of his own accord, but at Mr. Utley's request. His testimony was: "Mr. Goldstein told me that he knew he was offering prices greater than he could possibly pay for these furs; that he had to do that to get business, to compete with the larger fur houses; and he told me that he would stop it."

There was testimony that in January shipments of furs directed to the defendant were intercepted by the post office inspectors, were opened, and were submitted to qualified fur graders for examination, grading, and pricing. These fur graders were not advised as to whose furs they were examining nor as to the destination of the furs. While their opinions as to grades and prices differed in some instances as to separate items, which went to the weight of their evidence and not to its admissibility, their estimates were in general substantially higher than the grades and prices placed upon these furs by the defendant after the furs had been delivered to him through the mail.

If the jury believed the government's witnesses, as they obviously did, they were justified in finding that the material allegations of the indictment were true, that the defendant's scheme was intentionally fraudulent, and that, in furtherance of it, the mails were used.

 There is another question argued in the defendant's brief which is not found in the specifications of error, and that is that the court erred in receiving the evidence obtained by the post office inspectors through opening the parcels of furs mailed by shippers to the defendant, because it was obtained in violation of the defendant's constitutional rights. In these furs, at the time the parcels were opened, the defendant had no proprietary interest, and his constitutional rights were in no way invaded by the acts of the inspectors. Belcher v. United States (C. C. A. 8) 50 F. (2d) 573, 575; Graham v. United States (C. C. A. 8) 15 F.(2d) 740, 742; Rosenberg v. United States (C. C. A. 8) 15 F.(2d) 179, 180; Simmons v. United States (C. C. A. 8) 18 F.(2d) 85, 87; McMillan v. United States (C. C. A. 8) 26 F.(2d) 58, 60.

 The defendant also argues that the court submitted the case to the jury upon a theory unsupported by any evidence. The only exception which the defendant took to the charge of the court related to that portion of it dealing with circumstantial evidence, and no question is now raised as to its correctness in that regard. The charge was accurate and fair, and apparently met with the approval of both the government and the defendant at the time of the trial. The jurors were virtually told that the important controverted question in the case was whether the defendant had paid the prices for furs which he agreed to pay, and whether, if he did not, that failure was intentional or due to honest mistake.

[17] The question of the guilt or innocence of the defendant under the evidence was a question for the jury. We find no reversible error. The judgment is affirmed.