Timothy RUSH, Appellant,

v.

James SMITH, Silas Hardison, David Robbins, James Conway, Rita Krapf, Nesby Moore, Vincent Schoemehl, Appellees.

No. 93–3585.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1995.

Decided June 5, 1995.

Kenneth Dick, St. Louis, MO, argued for (Donald Singer, on the brief).

James J. Wilson, St. Louis, MO, argued for appellees (Ronnie L. White, on the brief).

Before RICHARD S. ARNOLD, Chief Judge, and McMILLIAN, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, and MURPHY, Circuit Judges, En Banc.

McMILLIAN, Circuit Judge.

Timothy Rush appeals from a final order entered in the district court for the Eastern District of Missouri denying his post-trial motions for a new trial or default judgment in this civil rights action brought under 42 U.S.C. § 1983. For reversal, Rush argues the trial judge erred in (1) dismissing the sole African–American juror, (2) making prejudicial comments to the jury, (3) denying his motions for new trial and default judgment based on defendants' abuse of discovery, and (4) denying his motion for new trial based on the grounds that the verdict was against the clear weight of the evidence. A panel of this court affirmed the judgment of the district court. This court subsequently granted rehearing en banc and vacated the panel's opinion. We now reverse and remand this case to the district court for a new trial.

## I. BACKGROUND

Rush, who is African–American, filed this civil rights action claiming that two police officers used excessive force against him. After an eight-day trial, running from February 22 through March 3, 1993, a jury returned a verdict for defendants, St. Louis police officers and the St. Louis Board of Police Commissioners, on Rush's excessive force claim. Resolution of this matter required the jury to choose between two conflicting accounts of what happened during the early morning hours of January 1, 1990. Rush claimed that around the time of the incident, 12:37 a.m., he was in his home with his grandmother and his cousin. Meanwhile, a friend, Michael Mayhorn, was in Rush's backyard, celebrating the New Year by firing a shotgun into the air. Rush's grandmother asked Rush to tell Mayhorn to stop firing the shotgun and to come inside. Rush approached the kitchen door, wearing only pajama bottoms, to ask Mayhorn to cease firing the shotgun. Rush testified that while standing sideways, bent over between the storm door and the wooden door, and looking into the backyard, he was shot in the abdomen by one of the police officers. Immediately after being shot, Rush made his way to a telephone in the hallway of his home and called

911 for assistance. The testimony of Rush's grandmother and his cousin corroborated Rush's version of the facts.

The two police officers told a different story. They were dispatched to Rush's neighborhood in response to a report that shots had been fired. They claim that they were fired upon by a shotgun as they approached Rush's backyard. They saw two men standing below the steps at the rear of the home. At trial, neither officer could identify Rush as having been one of the two men. Both officers did testify that the man firing the shotgun was wearing pants and a shirt. Officer Smith claimed that 25 to 31 shotgun blasts were fired at them and that the officers returned 13 to 16 shots before notifying the dispatcher of the situation. Smith testified that after he fired two shots, his first target slumped over, handed the shotgun to the other man, and entered the house by climbing the rear steps.

Rush was indicted in connection with this incident on state charges of first degree assault, armed criminal action, and unlawful use of a weapon. However, these charges were later dropped. Robert Craddick, an assistant circuit attorney for the city, testified that he explained to Smith that the pattern of the bullet holes made by the officers' weapons and other physical evidence revealed inconsistencies in Smith's version of the incident. Upon hearing this explanation of the weaknesses in the case, Smith offered to change his account and even admitted that Rush could have been inside the house when shot. After the memorandum of *nolle prosequi* was submitted on all charges, Smith tried to convince Craddick to reinstate the charges because he feared that he would be sued if Rush was not prosecuted.

Before trial, Rush presented defendants with a discovery request for production of documents concerning prior firearms training provided to St. Louis police officers, including defendant Smith. Defendants responded that they had no documents concerning the annual firearms qualification program as it was when Smith graduated from the police academy or concerning changes in the program since that time; that Smith had not attended any in-service firearms courses oth-

er than annual qualifications since graduating from the academy because such courses did not exist; and that they objected to requests for all proposals or requests presented to the Board of Police Commissioners concerning the provision of firearms training to St. Louis police officers and for all complaints where it was alleged that a St. Louis police officer had misused firearms or wrongfully shot at an individual. Among documents produced by defendants was a Police Department Special Order providing for an administrative investigation and report (ARTS report) regarding every incident in which an officer discharges a firearm, an annual shots fired report, and establishing a firearms review committee.

Rush then presented defendants with a second discovery request for production of documents, requesting production of the ARTS report on the incident at issue, all ARTS reports prepared pursuant to the Special Order, all annual shots fired reports, and all firearms review committee reports and recommendations. Defendants objected to the requests for the ARTS reports and for the shots fired reports as burdensome.

Rush then filed a motion to compel discovery of the documents not produced by defendants, and on February 11, 1993, there was a hearing on the motion. After the hearing, the trial judge ordered defendants to produce any documents showing purchases of firearms training equipment, any documents regarding firearms training proposals rejected during the previous seven years, and any information regarding the use or misuse of firearms by police officers. In addition, the trial judge ordered the Board of Police Commissioners to designate competent witnesses for deposition on this subject. Defendants produced documents regarding the purchase of a firearms simulator, but no documents concerning a 1992 firearms study, no ARTS reports, and no other documents concerning the use of firearms. The Board of Police Commissioners provided a list of potential witnesses for deposition.

On the first day of trial, February 22, 1993, Rush moved for default judgment based on allegations that defendants failed to comply with discovery orders; the motion was denied. On the third day of trial, defendants provided Rush with documents constituting the underlying materials for a study concerning police use of firearms conducted by the police department in 1992. On February 25, Rush again moved for default judgment; again, the motion was denied.

On the fourth day of trial, there was a severe snowstorm in St. Louis, resulting in ten to fourteen inches of snow on the ground by morning. Dorothy Mae Bluett, the only African–American juror, advised the trial judge's staff that she would not appear that day due to the weather. Before the trial judge's arrival at the courthouse, Rush's counsel asked a United States marshal to pick Bluett up in his car. The marshal agreed, and was in fact en route, when the trial judge called him back because only a "skeleton staff" was present in the court building that day. When the trial judge arrived at court, he told Rush's counsel that he would continue the trial with the jurors present because he had an alternate to replace Bluett and that it was too late to try to get Bluett to attend. Rush's counsel asked the trial judge's permission to send a taxicab for Bluett, but the trial judge denied the request. In his order denying the motion for new trial, the judge indicated that he had problems with a party providing transportation for a juror.

After the trial judge concluded that the trial would proceed without Bluett, the jury was brought into the courtroom. The trial judge then explained her absence to the jury as follows:

> Your eyeballs will indicate that your Juror Number Two is absent and we've previously discussed that, so we're going to proceed without her. Something just occurred to me, though, when I was being mildly scolded by the Plaintiff's attorneys for starting court late, that it was this Court's insistence that we have a black juror in this case, that put the black juror to the missing juror, Dorothy Mae Bluett in the box. I told all of you and I'm going to say this in front of the jury, it doesn't make any difference. It's a truth and I'm not afraid of the truth, but I was sincerely afraid of striking the only two blacks that were on that jury, that the Court of Appeals would

look askance at anybody being able to single out a particular race and eliminating them from consideration of this jury, so I, and I'm gonna take credit for this, I'm sorry. I've got to, I've got to preserve the justice and pursuit of justice by this Court, prevailed upon the City to put at least one of those black ladies on this panel so that Mr. Rush would be at least represented ethnic-wise or race-wise. I just, I'm not a damn fool. I haven't been around here for seventy-six years and not found out that the races have a tendency to stick together and that may be good or bad, but whatever it is, it exists.

IV Trial Tr. at 19. After the trial judge completed his remarks to the jury, counsel approached the bench:

MR. DICK [Counsel for Rush]: ... I know the Court's intention is good, but I would just, I think what was said might give the impression that the City was the one who graciously put a black juror on.

THE COURT: I put the black juror on. I said, "I did it." I asked the attorneys to do it. I didn't say which one.

. . . .

MR. SINGER [Counsel for Rush]: I thought the City gracious,—I thought you used the term that the City graciously agreed and maybe I'm mistaken, Judge but,—

THE COURT: Well, I'll clear it up if I did.

MR. SINGER: Well, now Judge, I think that'll only emphasize what was done.

THE COURT: Well, what do you want me to do?

MR. SINGER: Well, I mean, I'd like to go on and try this case. If your Honor thinks he can correct the measure without any further emphasis,—

THE COURT: Okay, let's go.

MR. SINGER: —then I would agree to do it, but,—Okay. The first witness, we had asked the City to produce Mr. Scott.

IV Trial Tr. at 20–21.

## II. DISCUSSION

In order to maintain the integrity of our judicial system, as established by the Constitution, we, the members of the judiciary, must constantly subject ourselves to rigorous examination. When the conduct of a judge interferes with the fundamental fairness of a proceeding and substantially affects the rights of a party, it is our duty to eliminate, to the extent possible, the consequences of such aberrant behavior. Because we conclude that the trial judge's remarks about racial solidarity constituted plain error, we reverse and remand the case for a new trial.[1]

Even the brief summary of the record we have provided clearly demonstrates the critical importance of the jury's assessment of witness credibility in the present case. As in all cases, the trial judge in the present case had a duty to maintain an atmosphere free from prejudicial comment. A prejudicial comment from the bench is worse than all others because it has the air of official sanction. For this reason, courts have long recognized that judges must be especially careful when making comments before a jury. "A trial judge must be especially cautious and circumspect in language and conduct during a jury trial. The judge must be fair to all parties and not do or say anything that might prejudice either litigant in the eyes of the jury." *Coast–to–Coast Stores v. Womack–Bowers*, 818 F.2d 1398, 1401 (8th Cir. 1987). This admonition reflects the vital role that the trial judge plays in a jury trial. More than a century ago, the Supreme Court explained the need for an exacting standard of judicial conduct: "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and

---

**1.** This is a troubling case on a number of fronts. Because we find the issue regarding the trial judge's comments to the jury to be dispositive, we will not address the other issues at length. We are, however, dismayed not only by the trial judge's comments about racial solidarity, but also by the conduct of defendants during pre-trial discovery, and the way in which the trial judge removed the sole African–American juror from the jury. The defendants flouted not only our liberal discovery rules but also the district court's order compelling production of documents. There is no excuse for such obstructionist tactics. With regard to the juror dismissal, we appreciate the trial judge's desire to move the case forward; we note, however, that a reasonable delay in the interest of the ultimate goal of justice is often the most prudent choice.

properly of great weight, and that his [or her] lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894). More recently, the Fifth Circuit reiterated this need for exemplary comportment: "By reason of his [or her] role, quickly observed by jurors, the judge is a figure of over-powering influence, whose every change in facial expression is noted, and whose every word is received attentively and acted upon with alacrity and without question." *Travelers Ins. Co. v. Ryan,* 416 F.2d 362, 364 (5th Cir.1969). The conduct of the trial judge in the present case simply does not meet these appropriately high standards.

■■■ Because there is some question as to whether Rush's counsel lodged a timely objection to the trial judge's comments, we assume, for purposes of analysis, that a contemporaneous objection was not made. When the complaining party has failed to object to the court's statements at trial, our review is for plain error only. *Cowens v. Siemens–Elema AB,* 837 F.2d 817, 823 (8th Cir.1988). Under plain error review, an error not identified by a contemporaneous objection is grounds for reversal only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected. *Fleming v. Harris,* 39 F.3d 905, 908 (8th Cir.1994). Moreover, when faced with an allegation of judicial misconduct, "[a]n appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage [a party] in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits." [2] *La Barge Water Well Supply Co. v. United States,* 325 F.2d 798, 802 (8th Cir.1963) (Blackmun, J.), *citing Goldstein v. United States,* 63 F.2d 609, 613 (8th Cir. 1933). While this court previously stated that a few improper comments are not necessarily enough to require reversal, we also recognized at the same time that each case of

allegedly prejudicial comments made by the trial judge "must turn on its own circumstances." *United States v. Singer,* 710 F.2d 431, 436 (8th Cir.1983) (en banc).

There is certainly a distinction to be drawn between cases of excessive judicial intervention in the questioning of witnesses, and cases in which a trial judge makes comments in the presence of the jury that appeal to bias or prejudice. There can be no doubt that the latter sort of judicial misconduct is a more potent contaminant. Aggressive questioning by the trial judge may, in some instances, actually benefit the truth-seeking function of the courts, though such active participation is not favored. Further, it is quite possible that a trial judge may be able to engage in such questioning without revealing his or her views on the merits of the case. However, when the trial judge's role loses it impartial character and tends to emphasize and accentuate one side's case over another's, a trial judge's participation becomes prejudicial and may require reversal. *See United States v. Bland,* 697 F.2d 262, 265 (8th Cir. 1983). The difference between this type of impropriety and the impropriety of comments which appeal to bias or racial prejudice is not one of degree, but of kind. Comments which appeal to such passions can never serve a salutary purpose. Even one instance of such comment, depending on the facts and circumstances of the case, may be sufficient to destroy the integrity of the entire proceeding. Outrageous comments of this sort will be exceedingly rare, but they unfortunately occur from time to time. This case is one such incident.

Before addressing the impropriety of the trial judge's comments on racial solidarity, we first note that the trial judge should not have told the jury that Rush's attorneys "scolded" him for being late. The trial judge should have refrained from making such a reference because of the danger that such characterization might unfairly disparage Rush and his counsel in the eyes of the jury. Most importantly, the trial judge committed

---

**2.** This restatement of our approach to claims of judicial misconduct corrects the alteration of a quotation from *La Barge Water Well Supply Co. v. United States,* 325 F.2d 798, 802 (8th Cir.1963), found in *Harris v. Steelweld Equip. Co.,* 869 F.2d 396, 400 (8th Cir.), *cert. denied,* 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989).

plain error by telling the jury that the races have a tendency to stick together. All the trial judge had to do was tell the jury that a juror was unable to attend and that an alternate would take her place.

■ While the trial judge's improper comments were not directed at the merits of Rush's case, our concern is that they might have effectively undermined the credibility of his corroborating witnesses. The potential for prejudice created by the utterance of the trial judge's racially polarizing remark to an all-white jury hearing a civil rights case brought by an African–American most of whose corroborating witnesses were also African–American is self-evident. A similar case was considered by a New York state appeals court over thirty years ago in *People v. Burris,* 19 A.D.2d 557, 241 N.Y.S.2d 75 (1963) (*Burris* ). That court's appreciation of the inequity of weighing testimony on the basis of racial similarity is instructive:

> In our opinion, the defendant did not receive a fair trial. Both the court and the assistant district attorney suggested to the jury that the identification of the defendant by the complaining witness should be weighed in the light of the fact that both defendant and the witness were negroes. We have firmly rejected the weighing of testimony on the basis of racial similarity or dissimilarity of witnesses. As identification here turned on the testimony of a single witness, a new trial is necessary to correct the possible effect on the jury of an argument which should be eschewed as false in its premise and divisive in its result.

*Id.* (citation omitted). The wisdom of that court's decision is compelling. While the trial judge in the present case did not expressly state that Rush's witnesses should be discredited, we believe that the danger of his implication demands a new trial as well. Even an inadvertent and indirect suggestion that Rush and his corroborating witnesses gave a consistent account of the events because of racial solidarity, and not because of

their sworn duty to tell the truth, is completely intolerable. Moreover, when such suggestion is made in a civil case, it will generally prove more damaging to the plaintiff because, on most issues, he or she has the burden of proof.

■ Because of the impracticality of determining what, if any, effect this racially-divisive remark had on the jury in the present case, to require a showing of actual prejudice would be tantamount to declaring such egregious comments unreviewable. We return therefore to the result in *Burris.* In that case, the court realized the importance of witness credibility and therefore determined that the "possible effect" on the jury was sufficient to merit a new trial. On the particular facts of this case, we hold that the potential for prejudice in the minds of the jurors was so great that no specific showing of actual prejudice is required.[3]

## III. CONCLUSION

Because we believe that the trial judge's comments in this case substantially affected Rush's right to a fair trial, we reverse and remand this case to the district court for a new trial.

HANSEN, Circuit Judge, concurring specially.

I agree with most all of the court's opinion and I readily concur in its judgment. I believe that the court is correct in finding plain error, but I write separately because I do not believe a "possible effect" on the jury or "the potential for prejudice," *ante.* at 922, is sufficient as a matter of current law to support a plain error reversal. As we have very recently observed, for there "to be plain error in a civil case, [the error] must have *'almost surely* affected the outcome of the case.'" *Champagne v. United States,* 40 F.3d 946, 947 (8th Cir.1994) (quoting *Angelo v. Armstrong World Indus., Inc.,* 11 F.3d 957, 961 (10th Cir.1993)) (other quotation

---

**3.** In *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993), the Supreme Court, while discussing the definition of plain error in the context of a criminal matter, recognized there may be forfeited errors that can be corrected on appeal regardless of their effect on the outcome. Further, the Court declined to address "those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Id.*

omitted) (emphasis added). Similarly, the criminal cases interpreting the Supreme Court's most recent elucidation of the plain error standard (applying Fed.R.Crim.P. 52(b)) in *Olano*, indicate that a "possible effect" or "potential for prejudice" is insufficient to establish plain error. *See, e.g., United States v. Turcks*, 41 F.3d 893, 898 (3d Cir.1994) (under *Olano* to establish "prejudice" requirement defendant must "show that the outcome of his trial was *actually affected*") (emphasis added); *United States v. Miro*, 29 F.3d 194, 200 (5th Cir.1994) (under *Olano* in normal case defendant must show "*actual prejudice*") (emphasis added); *United States v. Ullyses–Salazar*, 28 F.3d 932, 938 (9th Cir.1994) (plain error requires "*highly prejudicial* error" affecting substantial rights) (emphasis added).

I would conclude that the trial judge's comments here constituted plain error by finding that those comments give rise to a rebuttable presumption of prejudice. The Supreme Court specifically observed in *Olano* that there may be a category of cases where otherwise forfeited errors could be corrected regardless of their effect on the trial's outcome, or that there exists a category of errors that are presumed prejudicial even if the defendant cannot make a specific showing of prejudice. —— U.S. at ——, 113 S.Ct. at 1778. As our court's opinion notes, *ante.* at 923, n. 3, the Supreme Court did not address the nature of the errors that fall into those categories. In my view, the egregious and unprecedented comments made by the trial judge in this case are precisely the type of error that should be considered presumptively prejudicial.

Our court's opinion has thoughtfully and thoroughly explained the inherent danger of the trial judge's remarks here given the uniquely influential role of the trial judge coupled with the racially polarizing nature of the comments made to an all-white jury in a case brought by an African–American, most of whose key witnesses also were African–American. I would further add that a critical function of a trial judge is to ensure that the very type of highly inappropriate and irrelevant racially charged commentary involved in this case gets no play before the jury. The fact that the trial court itself, by its own comments, failed in this critical function troubles me deeply.

I too believe the risk of prejudice in a case like this is unacceptably high. I would conclude that in exceptionally rare cases, like this, where the trial judge makes racially oriented comments which tend to separate the trial's participants including the jury itself along racial lines, a rebuttable presumption of prejudice is warranted. *See generally United States v. Doe*, 903 F.2d 16, 25 (D.C.Cir.1990) ("Racial fairness of the trial is an indispensable ingredient of due process and racial equality a hallmark of justice"). The rare nature of the cases falling into this category makes them amenable to a presumption of prejudice because the category, by its very nature, would be very limited and easily definable.

As indicated, I would apply a rebuttable presumption of prejudice to this case. After reviewing the record, however, I find that not one of the arguments made by the defendants is sufficient to rebut the presumption. Accordingly, like our court, I would find plain error and would exercise our remedial discretion to reverse for a new trial because the error in this case strikes at the heart of the "integrity or public reputation of judicial proceedings." *Olano*, —— U.S. at ——, 113 S.Ct. at 1779 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

MAGILL, Circuit Judge, with whom BOWMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, join, dissenting.

The majority's opinion neglects to apply plain error review as delineated by the Supreme Court, overstepping the authority of this Court. We respectfully dissent.

Despite the majority's reluctance to make a finding, it is quite clear that Rush's counsel made no objection, express or implied, to the comment at issue in this case. Any implied objection by Rush's counsel was not to this comment, but to a different statement by the court. The exchange quoted at page six of the majority's opinion reveals that, if any objection at all was made by defense counsel, it was made in reference to the court's char-

acterization of the circumstances of Bleuett's seating on the jury, not to the court's statement about racial solidarity. The court's comment was never mentioned or referred to in the above exchange, and, when Singer said "if your Honor thinks he can correct the measure without any further emphasis," he was discussing the issue of who requested Bleuett's seating, not the court's comment regarding racial solidarity.

## I. PLAIN ERROR STANDARD

Because there was no objection, express or implied, to the comment regarding racial solidarity, this Court must review the court's comment for plain error. *Cowens v. Siemens–Elema AB,* 837 F.2d 817, 823 (8th Cir.1988). Plain error is a stringently limited standard of review, particularly in the civil context. It is a judicially-created exception to Rule 51 of the Federal Rules of Civil Procedure, which are binding on our court. We have no discretion to correct forfeited errors to which no objection was made unless they meet the plain error standard: "The forfeited error 'may be noticed' only if it is 'plain' and 'affect[s] substantial rights.' More precisely, the Court of Appeals may *correct* the error ... only if it meets these criteria." *United States v. Olano,* — U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (quoting Federal Rule of Criminal Procedure 52(b)). The Supreme Court recently clarified the standard for plain error review under Federal Rule of Criminal Procedure 52(b) (the more lenient criminal analogue to Rule 51). *Id.* at ——, 113 S.Ct. at 1776. The Fifth Circuit has commented that:

> Federal Rule of Civil Procedure 51 is even more restrictive than Criminal Rule 52(b); indeed, [the Ninth Circuit] holds that it allows no new attacks on instructions on appeal. We thus agree with the Sixth Circuit that '[t]he principles and decision enunciated in *Olano* apply *a fortiori* in the

civil context where courts pay less strict attention to procedural protocol.' *Olano* augments this court's long-standing rule that reversal for plain error is 'not a run-of-the-mill remedy' and will occur 'only in exceptional circumstances to avoid a miscarriage of justice.'

*Highlands Ins. v. National Union Fire Ins.,* 27 F.3d 1027, 1032 (5th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 903, 130 L.Ed.2d 786 (1995).

*Olano* sets out in detail three limitations on the Courts of Appeals' authority to correct forfeited errors. First, there must be an error. *Olano,* — U.S. at ——, 113 S.Ct. at 1777. An error consists of deviation from a legal rule, unless that rule has been waived. *Id.* Waiver extinguishes any error derived from the waived legal rule; failure to object, forfeiture, does not extinguish the error, but limits the right to correction of that error on appeal. *See id.* Here there was no waiver, and the comment was improper; there was therefore error.

Second, the error must be "plain," which is "synonymous with 'clear' or, equivalently, 'obvious.'" *Id.* We assume arguendo that the error in this case was plain, although the fact that counsel did not object to the comment when made is an indication that the error may not have been as plain as the majority seems to believe.

Third, the error must "affect substantial rights." *Id.* at —— – ——, 113 S.Ct. at 1777–78. In general, substantial rights are not affected unless a showing of prejudice is made. "[T]he error must have been prejudicial: It must have affected the outcome of the District Court proceedings." *Id.* at ——, 113 S.Ct. at 1778. The prejudice analysis in the plain error context is similar to a harmless error inquiry, "with one important difference:" In plain error review, the party claiming error bears the burden of showing that the error was prejudicial.[1] *See id.*

---

1. In *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1984), cited in *Olano,* — U.S. at —— ——, 113 S.Ct. at 1776–77, the Court explained the dangers of failing to require a showing of prejudice in plain error review: "A *per se* approach to plain-error review is flawed.... [F]ederal courts have consistently interpreted the plain-error doctrine as requir-

ing an appellate court to find that the claimed error not only seriously affected 'substantial rights,' but that it had an unfair prejudicial impact on the jury's deliberations.... To do otherwise could well lead to having appellate courts indulge in the pointless exercise of reviewing 'harmless plain errors'—a practice that is contrary to the draftsmen's intention

Rush, therefore, as the party claiming plain error in this case, bears the burden of showing specific prejudice to meet the third prong of the plain error standard.

The Supreme Court has recognized only two possible exceptions to the plain error requirement that specific prejudice resulted from a forfeited error: There "may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome," [2] and there may be errors "that should be presumed prejudicial if [the party claiming error] cannot make a specific showing of prejudice." *Id.* Nevertheless, "[n]ormally ... the [party claiming error] must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong...." *Id.*

Finally, once the three threshold requirements of the plain error standard have been met, the court has discretion to correct the forfeited error. *Id.* The court should exercise this discretion only when "a miscarriage of justice would otherwise result." *Id.* at ——, 113 S.Ct. at 1779 (quoting *Young,* 470 U.S. at 15, 105 S.Ct. at 1046). In the plain error context, a miscarriage of justice has occurred when an error has "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). This test is applied only after it has been established that the forfeited error affected substantial rights: "If the forfeited error is 'plain' and 'affect[s] substantial rights,' the Court of Appeals has authority to order correction, but is not required to do so." *Id.* at ——, 113 S.Ct. at 1778.

Under the Supreme Court's plain error analysis, therefore, Rush, as the party claiming plain error, bears the burden of showing specific prejudice to meet the third prong of the plain error standard, unless he can show that the error was of the special category of forfeited errors that can be corrected regardless of effect on outcome, or that prejudice should be presumed.

## II. ERROR THAT CAN BE CORRECTED REGARDLESS OF EFFECT ON OUTCOME

This Court has never treated improper judicial commentary during trial as error of the special category that can be corrected regardless of effect on outcome. In *Goldstein v. United States,* 63 F.2d 609 (8th Cir. 1933), this Court stated that "[t]he question which we are called upon to decide is whether these remarks during the progress of the trial were actually prejudicial to the defendant," *id.* at 613. This requirement of prejudice for plain error in the improper commentary context has been reaffirmed by this Court repeatedly since *Goldstein.* See *LaBarge Water Well Supply Co. v. United States,* 325 F.2d 798, 802 (8th Cir.1963) ("we must nevertheless conclude that [judicial commentary] prejudiced the defendant before a new trial may be ordered on such grounds"); *United States v. Porter,* 441 F.2d 1204, 1215 (8th Cir.) ("we determine that as to each of the defendants there was not sufficient prejudice [resulting from judicial commentary] to require reversal"), *cert. denied,* 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971); *and Harris v. Steelweld Equip. Co.,* 869 F.2d 396, 400 (8th Cir.) ("it must also be shown 'that [judicial commentary] prejudiced the defendant before a new trial may be ordered on such grounds' "), *cert. denied,* 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989).

The recent harmless error jurisprudence of the Supreme Court, involving the direct criminal appeal of admission of a forced confession, strongly suggests that we should not venture to change this long-standing rule. In *Arizona v. Fulminante,* 499 U.S. 279, 111

---

behind Rule 52(b), and one that courts have studiously avoided and commentators have properly criticized."
*Young,* 470 U.S. at 16–17 n. 14, 105 S.Ct. at 1046–47 n. 14 (internal citations omitted).

**2.** Confusingly, the Court has sometimes referred to such errors as ones in which a "presumption

of prejudice" is applied, *see Penson v. Ohio,* 488 U.S. 75, 87, 109 S.Ct. 346, 353, 102 L.Ed.2d 300 (1988), but in *Olano,* the Court used the phrase "presumed prejudice" to refer to a finding of prejudice derived from a threshold showing that a high risk of prejudice was present in the circumstances of the specific case. *See Olano,* —— U.S. at ——, 113 S.Ct. at 1781.

S.Ct. 1246, 113 L.Ed.2d 302 (1990), cited in *Olano* as pertinent to the limits of the prejudice requirement in plain error review, ―― U.S. at ――, 113 S.Ct. at 1778, the Court held that harmless error review applies to confessions obtained in violation of the Sixth Amendment, and delineated the distinction between constitutional violations susceptible to harmless error review and violations that are grounds for reversal regardless of impact on the outcome of the trial. *Fulminante,* 499 U.S. at 306–12, 111 S.Ct. at 1262–66. The Court listed examples of errors that are subject to harmless error review, among which were admission of a confession in violation of the Sixth Amendment, use of incorrect jury instructions, commentary regarding defendants' silence in violation of the Fifth Amendment, admission of identification evidence or hearsay in violation of the Sixth Amendment, and admission of evidence obtained in violation of the Fourth Amendment. *Id.* at 306–07, 111 S.Ct. at 1262–63. The Court found that:

> The common thread connecting these cases is that each involved "trial error"— error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.

*Id.* at 307–08, 111 S.Ct. at 1263–64. Constitutional violations that are not subject to harmless error review, such as denial of the right to counsel or trial before a judge financially interested in the outcome of the case, differ from trial errors in that they intrinsically affect the entire trial:

> These are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial. Since our decision in *Chapman,* other cases have added to the category of consti-

tutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury; the right to self-representation at trial; and the right to public trial. Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.

*Id.* at 309–10, 111 S.Ct. at 1264–65 (citations omitted). It is clear that inappropriate commentary by a judge, whatever the specific source of the impropriety, is not a structural defect affecting the framework within which the trial proceeds, but simple "trial error." [3] Like the improper admission of a confession or a hearsay statement, or the giving of incorrect jury instructions, a judge's commentary does not affect the framework of the trial from start to finish; it is an erroneous element within the trial that may or may not have affected the trial as a whole. The structural errors listed above all involve the ongoing and internal corruption of an essential element of a trial—judge, jury, advocacy, publicness—as mandated by the Constitution. Inappropriate judicial commentary consists of isolated additions to the information provided to the jury at trial, just as improperly admitted evidence does, and such additions are, unlike structural errors, susceptible to an examination of their impact in the context of the trial as a whole.

In an attempt to justify its failure to apply the plain error standard, the majority's opinion appears to draw a distinction between comments "that appeal to bias or prejudice" and "excessive judicial intervention in the questioning of witnesses," stating that the difference between these two types of impropriety "is not one of degree, but of kind" because commentary that appeals to "bias or racial prejudice" can never serve a salutary purpose, as can intervention in questioning, and because intervention need not reveal the judge's views on the merits of the case. Maj. op. at 922. It is not quite clear to us whether this distinction draws a line between racial

---

**3.** There is no allegation that the judge in the instant case was actually biased or lacked impar-

tiality.

comments and all other judicial comments or between judicial comments and judicial intervention regardless of racial content, but it appears to us that the intention is to separate racial comments from others. This distinction fails to address comments, such as the one in *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322 (8th Cir.1985), that are neither potentially constructive intervention nor related to race. In *Hale*, the judge said, in a products liability case, that he had "put air in a lot of tires, but never had one blow up on [him]." *Id.* at 1330. This comment was found not to have been error warranting reversal, despite the fact that it directly indicated a preference for the plaintiff over the defendant, and clearly served no salutary purpose.

Although characterized by the majority as a comment appealing to racial bias, the comment that "races tend to stick together" does not indicate a preference for one party over another nor, for that matter, does it indicate a preference for one race over another. Made in the context of explaining to the jury the removal of the only black juror,[4] the comment is equally applicable to all races

and, while inappropriate, cannot accurately be described as "biased" against one race or another. This comment cannot be distinguished from the comment in *Hale* as racially biased, but only as having racial content. It does not appeal to any racial prejudice latent in the jury, nor does it suggest that the judge harbors or condones such prejudice. The distinction proposed by the majority therefore must extend to all comments that include racial content if it is to distinguish this comment from comments such as the one in *Hale*. This broad distinction is unsupported by precedent[5] and runs contrary to the stringent requirements of plain error review. Further, we are unable to discern from the majority's opinion just what modifications to plain error review are proposed for review of comments with racial content. The opinion states that a showing of actual prejudice is not required, but fails to state whether no showing of prejudice is required or whether a showing that prejudice should be presumed is required, finding only that the "potential for prejudice is so great that no specific showing of actual prejudice is required."[6]

---

**4.** Incidentally, at jury selection, it was the court—at side bar—who literally importuned the prosecutor to retain this woman on the jury, ensuring that *Batson* was satisfied. I Trial Tr. 155–61.

**5.** The majority cites *People v. Burris*, 19 A.D.2d 557, 241 N.Y.S.2d 75 (1963), in support of its apparent contention that comments with racial content should receive a relaxed version of plain error review. Not only is *Burris* more than 30 years old and a New York state case not binding on this Court, but it is also not clear that *Burris* involved facts similar to those in this case. The majority quotes the entire opinion in that case, except for a first sentence summarizing procedural history. Maj. op. at 923. The only facts of the case included are that both the court and the prosecutor "suggested to the jury that the identification of the defendant by the complaining witness should be weighed in the light of the fact that both the defendant and the witness were negroes," and that identification in the case turned on the testimony of that single witness. *Burris*, 241 N.Y.S.2d at 76. Neither of these facts applies to this case: the court never actually suggested that the jury weigh testimony of witnesses according to racial identity, and this case did not turn on the testimony of a single witness.

**6.** We note that Judge Hansen's concurrence recognizes the method of plain error review delin-

eated in *Olano*, but fails then to apply this method in a manner consistent with the Supreme Court's analysis. Under the *Olano* analysis, there are three separate categories of error: errors for which no showing of prejudice need be made; errors for which a showing supporting a presumption of prejudice must be made; and errors for which a showing of specific prejudice must be made. *See Olano*, —— U.S. at ——, —— - ——, 113 S.Ct. at 1778, 1779–80. Under *Olano*, the party claiming error carries the burden of showing that, on the facts of the case, there was evidence that the specific error committed created a high risk of prejudice: A finding of inherent prejudice without facts that show a high risk that prejudice resulted in the specific case does not meet the plain error requirement. *See id.* at ——, 113 S.Ct. at 1781. Although the concurrence states that this error should be considered "presumptively prejudicial," it supports this contention, not with facts showing a high risk of prejudice in this case, but by citing the "inherent danger" of remarks with racial content, and stating that prejudice should be presumed in "... cases, like this, where the trial judge makes racially oriented comments which tend to separate the trial's participants along racial lines ..." Concurring op. at 924. This generalized danger attributed to comments that can take place in a wide variety of specific contexts is not sufficient to meet the requirements of a threshold showing supporting presumed prejudice.

Maj. op. at 923–924. The plain error analysis mandated by the Supreme Court in *Olano,* however, requires that either actual prejudice or facts supporting a presumption of prejudice be shown by the plaintiff unless the error is one of the special category that can be corrected on appeal regardless of effect on the outcome.

This distinction argued by the majority—between comments with racial content and other improper comments—bears no relation to the distinction between trial error and structural error that the Supreme Court has determined is relevant to the determination of whether a showing of prejudice is required. Racial content does not transform a comment from trial error to structural error, and cannot support the classification of improper judicial comments in the same category as such structural corruptions as violations of the right to counsel or the right to an impartial judge.

## III.  SPECIFIC AND PRESUMED PREJUDICE

Because improper judicial commentary is not structural error, it cannot be error of the special category that can be corrected regardless of effect on outcome; Rush thus must show either specific prejudice or facts supporting a presumption of prejudice. In *Olano,* the Court stated that "[t]here may be cases where an intrusion [into jury deliberations] should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" *Ola-*

Further, the concurrence describes this categorical presumption of prejudice as "rebuttable" by the defendants, citing *United States v. Doe,* 903 F.2d 16, 25 (D.C.Cir.1990). This reverses the burden of proof as allocated in *Olano:*

In sum, respondents have not met their burden of showing prejudice under Rule 52(b). Whether the Government could have met its burden of showing the absence of prejudice, under Rule 52(a), if respondents had not forfeited their claim of error, is not at issue here. This is a plain-error case, and it is respondents who must persuade the appellate court that the deviation from Rule 24(c) was prejudicial.

—— U.S. at ——, 113 S.Ct. at 1781. The concurrence would create a presumption of prejudice applicable to an entire category of error, regard-

*no,* —— U.S. at ——, 113 S.Ct. at 1780 (citations omitted). Similarly, in this case, a presumption of prejudice would not change the ultimate inquiry: Did the district court's comment affect the jury's perception of the witnesses and *thereby its verdict?* This Court's recent decision in *Champagne v. United States,* 40 F.3d 946 (8th Cir.1994), supports the application of the *Olano* requirement that the verdict be affected to civil plain error review:

In a criminal case, our evaluation would be governed by the case law interpreting Fed.R.Crim.P. 52(b).... Although there is no equivalent rule in civil procedure, the Supreme Court has described plain error in a civil case as 'obvious, or ... otherwise seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings.' Federal appellate courts have held, in addition, that for a challenged action to be plain error in a civil case, it must have " 'almost surely affected the outcome of the case.' "

*Id.* at 947 (quoting *Angelo v. Armstrong World Indus., Inc.,* 11 F.3d 957, 961 (10th Cir.1993)) (internal quotations and citations omitted) (emphasis added).

In *Olano,* the Court analyzed the claim of plain error first for "specific prejudice" and second for "presumed prejudice," finding that specific prejudice had not been shown, and, examining the facts of the specific case, that the presence of alternate jurors during jury deliberations, without more, does not create presumed prejudice. —— U.S. at ——, 113 S.Ct. at 1781.

less of the specific facts of the case, and cast the burden of showing absence of prejudice on the defendants. This runs directly contrary to the mandate of *Olano.* In *Doe,* a harmless error case in which the prosecutor gave, in summation, a lengthy dissertation that attributed a range of criminal activities to the entire Jamaican population of D.C., an objection was made to the summation, and the burden was on the government to show that the error was harmless. *Doe,* 903 F.2d at 23–24, 27. Under plain error review, when no objection was made, the burden is on the party claiming error; this is the reverse of harmless error analysis, in which an objection was made, and the burden is on the party claiming harmlessness.

Rush has not carried his burden of showing either specific prejudice or facts supporting a presumption of prejudice. As the majority points out, specific prejudice is very difficult to show in the context of erroneous judicial commentary, and Rush has made no such showing. A showing supporting presumed prejudice, however, as the Supreme Court observed, requires the party claiming error to show that the error affected the jury's verdict. *See id.* at ——, 113 S.Ct. at 1780.

The majority does not examine whether Rush has carried his burden of showing facts indicating that the comment affected the verdict: The opinion merely argues that comments with racial content are "different" from other improper judicial comments and asserts that the potential for prejudice from a "racially polarizing remark" is enough to meet the requirements of plain error review. To carry the threshold burden for presumed prejudice, however, a party must provide case specific facts that support the conclusion that the jury's verdict was affected by the improper comment. *See id.* at ——–——, 113 S.Ct. at 1780–81. A bare assertion that the comment had potential to prejudice the jury is not adequate to meet the plain error standard as delineated in *Olano.* Potential prejudice in theory is not enough; evidence that a high risk of prejudice existed under the circumstances of the case is required. Examining the facts of this case, we do not find that prejudice was likely to result from this single comment.

The majority characterizes the court's comment as "racially polarizing." In the circumstances of this case, however, the comment could not have a racially polarizing effect. Although Rush was black and the jury which remained was white, the defendants were not all white. Although the name defendant, officer Smith, was white, the defendant officer who was with him during the incident, who also fired shots at the Rush backyard, and who testified, was black. Defendant board of commissioners included several black members and several white members. Further, Rush states that all his "fact" witnesses were black: These "fact" witnesses were his grandmother and his cousin. The family relationship among Rush and his witnesses was far more likely to cause the jury to doubt their story than the fact that they were of the same race. At least one of Rush's expert witnesses was white. Thus, there were witnesses of both races testifying for both the plaintiff and the defendants, and at least some of the defendants were black. Accordingly, a statement that "races tend to stick together" does not indicate to the jury that they should favor one version of events over the other, since there were witnesses of the jury's own race and witnesses not of the jury's own race telling each version of the story, and there were witnesses of each race corroborating each version of the story.

Furthermore, the comment was a single incident occurring halfway through an eight-day trial. *See Hale,* 756 F.2d at 1330; *Cowens,* 837 F.2d at 824. We have often held that "a few improper comments are not necessarily enough to require reversal," *see, e.g., Hale,* 756 F.2d at 1330, and have considered the weight of improper comments in the context of the length and complexity of the trial, *see id.* (court's comment in product liability case that he had "put air in a lot of tires, but [he] never had one blow up on [him]" not sufficient for reversal, because this was a minor incident in a lengthy trial); *Cowens,* 837 F.2d at 824 (comments considered in light of entire seven-volume trial transcript). In this case, a single, brief improper comment was made in the midst of an eight-day trial. The comment did not reach the merits of the case or indicate a partiality for a particular party, and was not intended to prejudice any party, but to explain to the jury the replacement of one of their colleagues. The court's observation was made on a particularly chaotic morning in the middle of a lengthy trial, and the likelihood of the jury's deriving and then retaining any implication that they should disbelieve Rush's witnesses from this single comment is low.

In addition, this Court has held that "[t]he burden is on the appellant to show both error and prejudice, and 'error which in a close case might call for a reversal may be disregarded as harmless where the evidence of guilt is strong.'" *Chubet v. United States,*

414 F.2d 1018, 1021 (8th Cir.1969) (quoting *Thomas v. United States*, 281 F.2d 132, 136 (8th Cir.), *cert. denied*, 364 U.S. 904, 81 S.Ct. 239, 5 L.Ed.2d 196 (1960)) (internal citations omitted); *see Porter*, 441 F.2d at 1215 ("Errors of the trial court which may be prejudicial in a close criminal case, in the sense of being capable in such a situation of possibly affecting the result, can well be without any such rational possibility in a strong case, and thus not entitle the defendant to a reversal of his conviction. The reviewing court must, of course, be able to say with fair assurance that the errors complained of could not, with natural operation in the total setting and proceedings had, be regarded as having possessed any influencing effect." (quoting *Homan v. United States*, 279 F.2d 767, 771 (8th Cir.), *cert. denied*, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960))); *accord August*, 745 F.2d at 406 ("The court here ... made a specific finding that any possible prejudice that could have resulted from the remarks in question was far outweighed by substantial evidence of guilt.").

In our view, this was not a close case. As the majority states, this case turned on conflicting testimony, but the weight of the testimony was significantly in favor of the defendants. Rush's version of events was supported by only one eyewitness: his first cousin, who lived in the same house as Rush. The jury discredited her testimony that Rush spent the evening, until near-midnight, upstairs in bed, talking on the telephone. One of Rush's neighbors, Pamela Rudderforth, testified to seeing Rush running down the alley between their houses that evening at 8:45 with a shotgun. VI Trial Tr. at 32. His seventy-four year old grandmother's testimony did not contradict Rush's story, but it also did not support it. She testified that, at the time of the shooting, she was in the dining room watching television and could not see events taking place either in the kitchen or in the yard. I Trial Tr. at 203–08. She saw Rush pass through the dining room going toward the kitchen, but could not see whether he stayed in the kitchen, or went through the kitchen into the yard. In addition, officer George, a firearms expert who examined the area in which the incident took place, testified that he found sixty-five shell casings in the Rush backyard. VI Trial Tr. at 16.

Four eyewitnesses, including Smith's black partner, officer Hardison, and two of Rush's next-door neighbors[7] testified that they saw the events take place as Smith described them.[8] Rush's story was supported only by the testimony of a close relative who lived with him. The credibility of Rush's position was further undermined by the fact that jurors were informed that Rush was, at the time of trial, a felony convict and in the custody of Fulton state prison. This information was communicated to the jury panel and the two plainclothes state officers accompanying Rush were identified to jurors during voir dire. I Trial Tr. at 23, 48.

The jury's verdict for defendants reflects the low credibility of Rush's version of events and the weakness of Rush's evidence against defendants.

In sum, if the jury took any notice of the comment at all, given its brevity and timing, the comment applied to both parties, giving no particular indication that the jury should have believed one version of events over another. Further, the verdict for defendants was not affected because the evidence was strongly in favor of defendants, and the verdict in keeping with this evidence. We find that, on the facts of this case, Rush has not carried his burden of showing that we should presume that prejudice affecting the outcome of the trial resulted from the court's comment.

7. Mr. Miller, a city mechanical inspector, and Ms. Rudderforth, a certified nurse's assistant.

8. The majority makes much of the fact that the criminal charges against Rush stemming from this incident were dropped. In a criminal prosecution against Rush, the state must carry the burden of showing, beyond a reasonable doubt, that Rush committed the crimes with which he was charged. In a civil suit against police, Rush must carry the burden of showing, by a preponderance of the evidence, that the police acted in violation of his civil rights. A feeling by the prosecutor that a criminal case against Rush only had a 50% chance of success in no way translates to an indication that Rush's § 1983 suit had a significant likelihood of success.

## IV. CONCLUSION

We therefore dissent, and would affirm. Rush has not shown that the court's improper comment constituted plain error because he has not shown that the comment affected substantial rights: The error was not one that we have authority to correct regardless of its effect on the outcome of the trial; and Rush has shown neither specific prejudice nor facts supporting presumed prejudice.